UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANTHONY F. DEMATTIA,<br><br>*Plaintiff*,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>*Defendant*. | Civil Action No. 1:21-cv-00379-ACR |

**MEMORANDUM OPINION & ORDER**

Defendant the United States of America, through the Department of Army, the United States Army Human Resources Command ("HRC"), and the Department of the Army Board for Correction of Military Records ("Board"), denied Plaintiff Anthony Demattia's claim for disability benefits under the Traumatic Injury Servicemember's Group Life Insurance Program ("TSGLI"), 38 U.S.C. § 1975, 1980A. Plaintiff seeks judicial review, and the parties have cross-moved for summary judgment.

Plaintiff contends that the Board acted arbitrarily and capriciously in finding that he had not shown that he required assistance to perform activities of daily living ("ADL") for at least fifteen days. The record does not support this claim. Therefore, upon consideration of the motions and the administrative record, and for the reasons discussed below, the Court **GRANTS** Defendant's Motion for Summary Judgment (Dkt. 19) and **DENIES** Plaintiff's Motion for Summary Judgment (Dkt. 17).

1

I.     BACKGROUND

Plaintiff, a veteran of the United States Army,[1] suffered a traumatic brain injury ("TBI") following an assault outside of a bar in 2011.  *See* Dkt. 17-3 at 1; Dkt. 19-1 at 5.  He submitted a claim under the TSGLI, which required him to show that he could not perform two or more activities of daily living for fifteen or more days.  Administrative Record ("AR") at 18–33.[2]  Plaintiff's claim was denied, and the Board denied his appeal.  *Id.* at 34–36, 120–121, 156, 295, 710.  Plaintiff filed this action on February 11, 2021.  Dkt. 1.  On August 18, 2021, the Board agreed to re-review Plaintiff's claim and again denied it on March 2, 2022.  Dkt. 13; Dkt. 15 at 1; *see also* AR 756.

   A.  **Statutory and Regulatory Framework**

Servicemembers' Group Life Insurance ("SGLI") covers eligible members of the U.S. armed services.  *See* 38 U.S.C. § 1967; *Hensley v. United States*, 292 F. Supp. 3d 399, 402 (D.D.C. 2018) (citing *Ridgway v. Ridgway*, 454 U.S. 46, 50–54 (1981)).  In 2005, Congress established the TSGLI to "provide short-term financial assistance to servicemembers and veterans who have suffered from traumatic injuries."  *Barker v. United States*, 404 F. Supp. 3d 251, 254 (D.D.C. 2019) (citing 38 U.S.C. § 1980A).

To qualify for TSGLI benefits, a servicemember must sustain a traumatic injury that results in a "qualifying loss."  38 U.S.C. § 1980A(a)(1).  Qualifying losses include total and permanent losses of certain senses, including sight, speech, or hearing, but not smell, as well as "the inability to carry out the activities of daily living resulting from traumatic injury to the

---

[1] Though it makes this adverse decision, the Court expresses its sincere appreciation to Plaintiff for his service to our country.

[2] The Administrative Record is consecutively paginated and docketed across Dkt. 25-1, Dkt. 26-1, and Dkt. 26-2.

brain." *Id* § 1980A(b)(1).  For a traumatic brain injury, the servicemember must establish, by a preponderance of the evidence, that he was unable to "independently perform" at least two ADLs for at least fifteen straight days.  *Traumatic Injury Protection Under Servicemembers' Group Life Insurance (TSGLI): A Procedural Guide (version 2.5)* ("*Procedures Guide, v2.5*") at 25, https://www.benefits.va.gov/INSURANCE/docs/TSGLIProceduresGuide.pdf.[3]

While the statute identifies applicable ADLs—bathing, continence, dressing, eating, toileting, and transferring, 38 U.S.C. § 1980A(b)(2)(D)—it does not say what it means to "independently perform" an ADL.  Helpfully, the Department of Veterans Affairs has issued relevant guidance:

> A member is considered to have a loss of ADL if the member **REQUIRES assistance** to perform at least two of the six activities of daily living.  If the patient is able to perform the activity by using accommodating equipment (such as a cane, walker, commode, etc.) or adaptive behavior, the patient is considered able to independently perform the activity.

Dkt. 19-4, *Traumatic Injury Protection Under Servicemembers' Group Life Insurance (TSGLI): A Procedural Guide (version 2.38)* at 6.  A servicemember "require[s] assistance" if he is "incapable of performing the ADL without physical, stand-by, or verbal assistance."  *Barker*, 404 F. Supp. 3d at 254; *see also id*. at 7.

"Although the TSGLI program is administered by the VA, the service branches, which are components of the Department of Defense, are separately responsible for determining whether their members are covered by the TSGLI and whether service personnel sustained a qualifying loss."  *White v. United States*, No. 17-cv-193, 2018 WL 5251740, at *2 (D.D.C. Oct. 22, 2018) (citing 38 U.S.C. § 1980A(f)).  A member may appeal an adverse eligibility

---

[3] Because Defendant attaches only an excerpt of the version of the TGSLI Procedural Guide the Board used to its Cross-Motion for Summary Judgment (version 2.38, Dkt. 19-4), the Court cites to the full version available online (version 2.5) for propositions outside the excerpt.

determination through a three-tiered appeal process within the member's branch of the uniformed service. 38 C.F.R. § 9.20(h)(1). Army service members "appeal first to the Army TSGLI Office, then to the Army Human Resources Command TSGLI Appeals Board, and finally to the [Board]." *White*, 2018 WL 5251740, at *2; *see also Procedures Guide, v2.5* at 55. Applicants for TSGLI benefits may also seek judicial review in federal district court. *See* 38 U.S.C. § 1975; *Hensley*, 292 F. Supp. 3d at 403.

### B. Plaintiff's Medical History

On April 21, 2004, Plaintiff enlisted in the Army, which deployed him to Kuwait and Iraq from August 18, 2006 to October 31, 2007. AR at 738. In October and November 2006, while in Iraq, Plaintiff suffered two TBIs. *Id.* at 19.[4]

On or about May 22, 2011,[5] Plaintiff was physically assaulted after a fight outside of a bar in El Paso, Texas. *Id.* at 39. After developing a headache and right arm pain that did not improve with Tylenol, Plaintiff drove himself to the emergency room at William Beaumont Army Medical Center ("WBAMC"), where he also reported imbalance with "some dizziness and blurry vision." *Id.* at 111. A head CT showed a bilateral frontal contusion, and a c-spine MRI was normal with no obvious sign of fractures. *Id.* at 113. The hospital discharged Plaintiff the next day with the following order:

> You have a follow up with Dr[.] Caram (neurosurgery) on 9 June @ 0800 hrs[.]
> Continue all home medications as previously prescribed by your PCP[.] Your
> discharge meds are Tylenol #3 for pain[.] You may shower daily and wash
> surgical wounds with soap and water.  No bath/pool/hot tub until approved by the

---

[4] Though Plaintiff reported the TBIs suffered in Iraq in his TSGLI applications, he does not provide any contemporaneous medical documentation relating to them in the Administrative Record. *See generally* AR.

[5] The date of Plaintiff's injury varies in medial documents. For clarity, the Court will use the date that both parties use in their summary judgment motions: May 22, 2011. *See* Dkt. 17-3 at 1; Dkt. 19-1 at 5.

>surgeon[.] Return to the ER if your wounds develop redness/swelling/warmth or purulent discharge.  Also return if you develop a fever.

*Id*.  WBAMC restricted Plaintiff from functional activities for one month, including bending, climbing, crawling, crouching, jumping/landing, sitting, or standing, and stated that Plaintiff would need to "run or walk at his own pace and distance."  *Id.* at 47.

Two days after his assault, Plaintiff had his first follow up appointment at the Soldier Family Medical Center TBI clinic with Dr. Sean Sebesta.  *Id.* at 60.  In Dr. Sebesta's appointment notes, under history of present illness, he wrote: "Headache with vomiting.  Vision problems.  Dizziness with headache and decreased concentrating ability reading, watching TV and with conversations.  No memory lapses or loss.  Difficulty with balance."  *Id.* at 62.  Dr. Sebesta also noted that at the time of the visit, Plaintiff was not experiencing nausea or a "generalized decrease in strength."  *Id.*  He continued:

>No vertigo, no lightheadedness, no fainting, no decrease in consciousness, no confusion, and no disorientation.  Misplacing items and forgetting names.  No convulsions, no focal disturbances, no mouth droop, and no slurred speech.  Forgetting words, difficulty finding desired words, and difficulty expressing formulated concepts.  No problem with stuttering and no involuntary movements.  Poor coordination (inherent—lifelong).

*Id.*  During the neurological portion of the exam, Dr. Sebesta noted that "Romberg's sign was present (near present—[Plaintiff] obviously fighting to keep his balance).  Patient was able to walk a straight line."  *Id.* at 63 (cleaned up).  Finally, Dr. Sebesta noted that Plaintiff's heel and toe walking was normal, and that he did not observe ataxic gait or antalgic gait.  *Id.*  Dr. Sebesta diagnosed Plaintiff with a moderate TBI and released him without limitations, but with a follow up in three weeks "or sooner if there are problems."  *Id.* at 70.  Dr. Sebesta also referred Plaintiff to speech, occupational, and physical therapy.  *Id.* at 69.  There is no record that Plaintiff followed up with Dr. Sebesta or the TBI Clinic.  *See generally* AR.

On June 3, 2011, twelve days after the assault, Plaintiff had "a routine optometry appointment." *Id.* at 751. The provider "noted his refractive error and regular astigmatism, ordered some glasses for the applicant, and recommended he return to the clinic if there were problems with the new lenses, otherwise to return for evaluation in 1 year." *Id.* On June 6, 2011, a physical therapist "prescribed [Plaintiff] a home exercise program for improving his injured vestibulo-ocular reflex." *Id.* at 73–74, 723.

On June 10, 2011, Plaintiff had neurosurgery and physical therapy appointments. *Id.* at 73–74, 95–98. Plaintiff's neurosurgeon, Dr. Pedro Caram, noted that Plaintiff experienced anosmia (loss of smell), headaches, dizziness, and numbness, but not nausea. *Id.* at 97. Dr. Caram's physical examination found normal reflexes and a negative Romberg and cerebellar. *Id.* 97–98. He released Plaintiff with work restrictions and highlighted: "I do not want him driving[;] he has been counseled." *Id.* at 97. The notes from his physical therapy appointment reflect that Plaintiff "report[ed] that he just finished with COL Caram (Neurosurgery) and there [was] a concern for a skull fx with [cerebrospinal fluid ("CSF")] leak due to nasal drainage . . . [Would] hold aerobic training, positional testing due to dependent head position, and dynamic balance assessment until imaging is complete." *Id.* at 74.

Plaintiff received a brain MRI on June 13, 2011, which did not find a CSF leak. *Id.* at 195. Instead, the findings were "consistent with chronic sinusitis involving multiple sinuses. Questionable air-fluid level [was] seen within the left maxillary sinus indicating possible acute on [sic] chronic sinusitis. . . . Evidence of prior traumatic brain injury showing encephalomalacia change affecting bilateral frontal lobes, right greater than left . . . ."

*Id.* at 59. The radiology report recommended a follow up if "persistent clinical concerns" remained. *Id.* The findings aligned with Plaintiff's medical history; on March 23, 2011—two

6

months before his injury—Plaintiff had received a CT of his sinuses that found "chronic pansinusitis." *Id.* at 65–66.

After Plaintiff's June 13 MRI, no contemporaneous documentation of injury exists other than follow-ups for anosmia. *See e.g.*, *id.* at 53 (November 7, 2011, MRI for anosmia); *id.* at 52 (April 19, 2012, same).

### C. Procedural History

#### 1. The Original TSGLI Claim and Reconsideration

On June 14, 2012, Plaintiff submitted a TSGLI claim to U.S. Army Human Resources Command ("AHRC"), with Dr. Sebesta as his certifying medical professional. *Id.* at 18–33.[6] Plaintiff's statement specified that he sought TSGLI benefits for multiple TBIs, with anosmia as his traumatic injury:

> I have suffered a traumatic brain injury in Iraq in October 2006 (IED), another one in November 2006 (RPG), then in June 2011 I suffered another traumatic brain injury due to an assault. One month later I lost my sense of smell. I have continued to go through all the steps necessary to correct this loss e.x. [sic] ENT, neurology, and TBI Dr's but all say its due to my TBI. Due to all my brain injuries my MRI's show a change to the health of my brain. There are currently no cures or real diagnostics for anosmia. It is troubling and causes serious dangers due to the fact that I cannot smell fire or gas or anything that can be harmful.

*Id.* at 19 (cleaned up). Dr. Sebesta certified: "[Servicemember ("SM")] has had multiple TBIs. He developed anosmia due to a TBI. SM believes consideration of this loss for TSGLI is warranted. Please evaluate and determine." *Id.* at 29.

---

[6] To submit a claim for TSGLI benefits, "a plan participant must file a form SGLV 8600 with his service branch. This form has two parts: Part A, to be filled out by the claimant, and Part B, the 'Medical Professional's Statement,' in which the claimant's physician must certify the qualifying losses claimed." *Hensley*, 292 F. Supp. 3d at 402–03 (quoting *Austin v. United States*, 614 F. App'x 198, 200 (5th Cir. 2015)).

The TSGLI Schedule of Loss does not list anosmia as a qualifying loss. 38 U.S.C. § 1980A(b)(1). Thus, AHRC denied Plaintiff's claim on November 8, 2012. AR at 34. AHRC informed Plaintiff that "[t]o be eligible for a TSGLI payment, [he] must have suffered a 'qualifying loss,' which is any [loss] listed on the TSGLI Schedule of Loss. Because [he] did not suffer a qualifying loss, [his] branch of service could not approve [his] claim." *Id.* AHRC also included information describing Plaintiff's appeal rights and the basic eligibility requirements for TSGLI claims. *Id.* at 34–36.

On February 14, 2013, Plaintiff requested reconsideration. *Id.* at 38–114. Plaintiff acknowledged that anosmia did not qualify as a loss, and so included medical documentation of claimed additional losses. *See id.* at 39, 47–114. Plaintiff stated that in addition to his loss of smell, the May 21, 2011 assault resulted in an inability to perform the ADLs of bathing, dressing, toileting, and transferring. *See id.* at 39. Dr. Sebesta's new certification stated that Plaintiff could not perform ADLs, problems he had not identified in his first certification:

> SM was placed on a profile that was extremely restrictive under the guidance of the neurosurgeon which saw this patient while in the ICU. There was concern for an ongoing CSF leak and SM was not allowed to bend over, climb, crawl, crouch, push/pull, run, sit or stand. SM had chronic nausea with intermittent vomiting for approximately 6 weeks after this injury (DOI 5/22/11). Due to this and his instability standing he had impairments in his ADLs such as transferring, toileting, dressing, and bathing. Due to his condition he was also placed on convalescent leave for approximately 6 weeks due to medical concern for the severity of his injury and symptoms.

*Id.* at 43. Dr. Sebesta added that Plaintiff required hands-on and stand-by assistance for bathing, dressing, toileting, and transferring from May 22, 2011, to August 22, 2011, because Plaintiff "[w]as unable to bend over due to concern for possible CSF leak from nose x [sic] 30 days" and his balance was impaired. *Id.* at 44–45.

On April 18, 2013, AHRC denied Plaintiff's reconsideration request, stating that his other medical documentation "did not indicate that [his] injury . . . rendered [him] incapable of

8

performing" ADLs for fifteen medical days or greater. *Id.* at 120. Once again, the AHRC included Plaintiff's appeal rights. *Id.*

Plaintiff hired an attorney, and on May 6, 2013, submitted an appeal to the AHRC. *Id.* at 122–33. On July 24, 2013, the AHRC denied the appeal because "[t]he medical documentation [Plaintiff] submitted did not indicate that [his] injuries rendered [him] incapable of performing the ADLs of bathing, dressing, toileting, or transferring that are covered by TSGLI standards for 15 consecutive days or greater." *Id.* at 156. AHRC advised Plaintiff of his appeal rights to the Board. *Id.*

On November 30, 2016, Plaintiff submitted another appeal to AHRC, and on December 1, 2016, supplemented his appeal with new and material evidence. *Id.* at 172–174, 589–594. On December 7, 2016, a Program Manager informed Plaintiff that he had exhausted his appeal rights with the TSGLI and he must take further appeals to the Board. *Id.* at 292.

### 2. The Board's Review

On December 16, 2016, Plaintiff filed an appeal and supplemental evidence with the Board. *Id.* at 308–703. This appeal included a certification from Independent Nurse Reviewer Teri Burns, who shortened the claimed ADL disability period from May 22, 2011 to June 22, 2011, as opposed to from May 22, 2011 to August 22, 2011. *Id.* at 44–45, 325–327. It also included a statement from Plaintiff's wife. *Id.* at 593–594.

On October 26, 2020, the Board denied Plaintiff's appeal and informed him that the decision was final and that he could request reconsideration only if he presented "new evidence or argument." *Id.* at 710. The Board included its record of proceedings, *id.* at 711–20, which explained that "[b]ased upon the available documentation and the findings of the medical advisor, the Board concluded there was insufficient evdidence [sic] of an error or injustice which

9

would show the applicant was unable to independently accomplish two or more of his ADL for 15 or more days after the assault with resultant TBI." *Id.* at 718. The Board relied on two medical advisory opinions, one from the TSGLI office and one of its own. *Id.* at 722–724, 732. Both concluded that Plaintiff did not meet the requirements. *Id.*

On February 11, 2021, Plaintiff filed the present Complaint alleging that the Board "has standardized its claim denial practices in a manner that is arbitrary, capricious, unsupported by its own guidelines, and contrary to law, Dkt. 1 ¶ 28, and seeking review of the Board's decision, *Id.* ¶ 35. On August 3, 2021, the parties consented to voluntary remand, to allow the Board to "'reconsider its previous position' without admitting error." Dkt. 13 at 1 (citing *Util. Solid Waste Activities Grp. v. EPA*, 901 F.3d 414, 436 (D.C. Cir. 2018)). On February 28, 2022, the Board reaffirmed its original decision. AR at 737–58.

## II.   LEGAL STANDARD

In an APA case involving cross-motions for summary judgment, "the Court's role is limited to reviewing the administrative record, so the standard set forth in Rule 56 does not apply." *Cap. Area Immigrants' Rts. Coal. v. Trump,* 471 F. Supp. 3d 25, 36–37 (D.D.C. 2020) (cleaned up). Instead, "summary judgment serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Id.* (cleaned up). The Court may set aside an

agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).[7]

This Circuit uses "an unusually deferential application of the arbitrary or capricious standard" when reviewing military decisions under the APA because 10 U.S.C. § 1552(a)(1) states that the Secretary "*may* correct any military record . . . when the Secretary *considers it necessary* to correct an error or remove an injustice." *Hensley*, 292 F. Supp. 3d at 408 (cleaned up). That said, "our Circuit does not appear to have considered whether this standard applies in a case involving a military board's decision on a TSGLI benefits claim," and "some district courts in this Circuit have been reluctant to apply this level of deference in TGSLI cases." *Toledo v. United* States, No. 21-cv-1286, 2022 WL 17039194, at *2 n.1 (D.D.C. Nov. 17, 2022) (citing *Cloud v. United States*, No. 17-cv-316, 2019 WL 1924363, at *5 (D.D.C. Apr. 30, 2019)). As Plaintiff's claims fail under either standard, the Court applies the traditional arbitrary and capricious standard.

The arbitrary and capricious standard is "highly deferential" and "presumes the agency's action to be valid." *Env't Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981). "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its ation . . . ." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "In reviewing that explanation, [a court] must 'consider

---

[7] Defendant argues that the Board decisions are subject only to arbitrary and capricious standards of review—not substantial evidence review—because the Board is not a specially designated board under 10 U.S.C. § 1558(b)(1)(A). Dkt. 19-1 at 15. The point is interesting, but not consequential because "[w]hen the arbitrary or capricious standard is performing [the] function of assuring factual support, there is no substantive difference between what it requires and what would be required by the substantial evidence test." *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 745 F.2d 677, 683–84 (D.C. Cir. 1984) (emphasis omitted).

whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Id.* (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)). "Indeed, nothing more than a 'brief statement' is necessary, as long as the agency explains 'why it chose to do what it did.'" *Coe v. McHugh*, 968 F. Supp. 2d 237, 240 (D.D.C. 2013) (quoting *Tourus Recs., Inc. v. Drug*, 259 F.3d 731, 737 (D.C. Cir. 2001)).

## III. DISCUSSION

### A. The Board Applied the Correct Evidentiary Standard

The Board applied the preponderance of the evidence standard to Plaintiff's TSGLI appeal. AR at 748. In his Complaint, Plaintiff claims that the Board should have instead used the "benefit of the doubt" standard, which applies to the Secretary of Veterans Affairs. Dkt. 1 ¶¶ 30, 35; *see* 38 U.S.C. § 5107(b). Plaintiff changes tack in his Motion for Summary Judgment. There, he concedes that the "preponderance of evidence" standard applied. Dkt. 17-3 at 13. Defendant agrees, *see* Dkt. 19-1 at 17 (citing 32 C.F.R. § 581.3(e)(2)), as does the Court.[8] Plaintiff is thus incorrect in stating that the Board "fail[ed] to apply the proper legal standard, or any legal standard in its review of Plaintiff's claim." Dkt. 17-3 at 17.

---

[8] Courts in this Circuit reject the benefit of the doubt standard in favor of the preponderance of the evidence standard. *See*, *e.g.*, *Sorkness, v. United States*, No. 17-cv-2248, 2019 WL 4451990, at *4 (D.D.C. Sept. 17, 2019) ("Sorkness ignores both the plain language of the 'benefit of the doubt' statute, 38 U.S.C. § 5107(b), and the regulations promulgated by the Department of Veterans Affairs . . . to implement the TSGLI program, which considered the applicability of the benefit of the doubt standard to TSGLI claims." (citation omitted)); *Hayes v. United States*, No. 21-cv-362, 2022 WL 2817598, at *4 (D.D.C. July 19, 2022) (adopting the holding in *Sorkness*); *Pendergrass v. U.S. Dep't of Def.*, No. 17-cv-0546, 2020 WL 5406043, at *9–11 (D.D.C. Sept. 9, 2020) (same).

Plaintiff argues that under the preponderance of the evidence standard, "an award should be granted when the evidence supporting a claim is ever so slightly more than the evidence against a claim." *Id.* at 13.  Plaintiff then quotes various medical documents that he argues demonstrate his inability to perform ADLs by a preponderance of the evidence.  *See id.* at 14–17.  But preponderance of the evidence is the review standard that the *Board* applies, not this Court.  *Fulbright v. McHugh*, 67 F. Supp. 3d 81, 95 (D.D.C. 2014), *aff'd sub nom. Fulbright v. Murphy*, 650 F. App'x 3 (D.C. Cir. 2016).  "As long as the [B]oard's determination adequately states the reasons for its decision and was in the realm of reason, this Court must defer to it." *Id.*; *see also Moreno v. Spencer*, 310 F. Supp. 3d 83, 88 (D.D.C. 2018).

### B. The Board's Decision Was Not Arbitrary or Capricious

In his Reply, Plaintiff responds by focusing his argument on issues that this Court can address.  Dkt. 22 at 4–5.  Plaintiff argues that the Board should not have relied on a lack of medical records surrounding his ability to perform ADLs.  Dkt. 17-3 at 17–22.  Instead, it should have allowed the statements provided by himself, his wife, Dr. Sebesta, and Nurse Burns to fill the gaps.  *Id.*  This argument fails at each step.

***The Lack of Evidence.***  When considering Plaintiff's appeal, the Board began with a comprehensive review of Plaintiff's medical documents and personal statements.  *See* AR at 737–753 (summarizing documents submitted for review).  After the Board "considered all of the evidence of record and weighed it accordingly," it gave the most weight to the contemporaneous medical records "since [they] document[] the applicant's condition at the time in question." *Id.* at 754.

The Board found that the contemporaneous medical records did not contain any evidence that the applicant required personal assistance to perform one or more ADLs. *Id.*  It also noted

13

that Plaintiff did not schedule any follow ups after June 13, 2011, when the MRI ruled out a CSF leak.  *Id.*  It relied both on its own assessment of the records and on two advisory opinions.[9]  *Id.* at 754-55.  It concluded that while Plaintiff's documented CSF constraints[10] "would certainly curtail a person's activities, they would not result in the inability to perform two or more ADLs with or without activity modification and/or assistive devices."  *Id.* at 755.

This review was far from arbitrary and capricious.  "Courts have regularly found that [the] Board . . . may rely on a lack of evidence that the applicant required personal assistance to perform one or more ADLs to deny claims for TSGLI benefits."  *Pendergrass*, 2020 WL 5406043, at *14 (surveying cases).  Here, the Board carefully reviewed the medical records and found them to not contain the necessary evidence.  *See supra* Section I.C.2.  Further, Plaintiff's physicians directed him to schedule follow up appointments if needed.  *See, e.g.*, AR at 66.  He did not do so, which could reasonably lead the Board to conclude that his symptoms, whatever they had been, had subsided.

***The Caregiver Statements.***  "Although 'courts have found that an agency's failure to consider, or to discount, firsthand caregiver statements without explanation may render [the] agency's decision to deny TSGLI benefits arbitrary and capricious,'" the Board "is free to give

---

[9] The Board's reliance on advisory opinions was proper.  *See Roberts v. United States*, 741 F.3d 152, 158–59 (D.C. Cir. 2014).  "[B]oards routinely adopt such advisory opinions, and may do so provided that the opinions themselves are not arbitrary and capricious."  *Hensley*, 292 F. Supp. 3d at 408 (citing *McDonough v. Stackley*, 245 F. Supp. 3d 1, 5 (D.D.C. 2017)).

[10] CSF precautions include "[a]void[ing] lifting anything over 10 pounds"; "[a]void[ing] bending lifting, stretching and twisting"; "[a]void[ing] straining to have bowel movements" ("stool softener is often prescribed"); "[a]void[ing] coughing and sneezing, but if you must, do[ing] so with your mouth open"; "not blow[ing] your nose"; "[a]void[ing] use of straws"; and "[k]eep[ing] your back straight during all movements (bend[ing] at knees and hips)."  AR at 723–24.

14

[such statements] little or no weight, as long as it 'adequately explain[s] the basis for [that] decision.'" *Pendergrass*, 2020 WL 5406043, at *15 (third and fourth alterations in original) (quoting *Rich v. United States*, 369 F. Supp. 3d 263, 274–75 (D.D.C. 2019)).  That is what occurred here.  The Court addresses whether the Board considered each relevant statement in turn below.

    *Plaintiff's Statements*.  In deciding to deny Plaintiff's claim, the Board considered Plaintiff's statements and explained that it did not find them "persuasive or entirely credible" because they lacked detail and conflicted with his medical records.  AR at 740, 755.  And, even if the Court could weigh them, it agrees with the Board that they do not support his claims.  In Plaintiff's reconsideration request, he stated: "I was not able to walk, drive, dress, bend over, sit or stand, shower, get in or out of bed, use the bathroom getting on and off the toilet.  My wife had to force me to eat because of my headaches were so severe I was throwing everything up.  This went on for several months."  *Id.* at 39.  Yet, two days after the assault, Dr. Sebesta stated that Plaintiff was not experiencing any nausea, vomiting, or difficulty washing.  *Id.* at 77.  Dr. Caram, nineteen days after the assault, noted that Plaintiff was having headaches but had "been able to eat" and was "not nauseated" (though he did "feel dizzy"), and advised Plaintiff against driving—indicating Plaintiff had been doing so.  *Id.* at 97.

    *Plaintiff's Wife's Statement*.  In deciding to deny Plaintiff's claim, the Board considered Plaintiff's wife's statement.  *Id.* at 743.  The Board did not find her statement "persuasive or entirely credible" because it conflicted with Plaintiff's medical records and did "not provide a time period that [Plaintiff] required assistance or describe what tasks she performed and how she performed them."  *Id.* at 755.  And, even if the Court could weigh it, it agrees with the Board that it does not support Plaintiff's claims.  This District found it arbitrary and capricious when the

15

Board "provided a summary of [the plaintiff's wife's] affidavit that made its significance clear: if true, it would entitle [the plaintiff] to the relief he sought," yet did not provide a meaningful reason for discounting the story. *Hensley*, 292 F. Supp. 3d at 412. This is not the case here. Plaintiff's wife's statement provided:

> When I walked with him, he was walking really slow. To me, it was very bad. I was wondering if he was going to be okay? Because, he could not walk. And, he is taller than I am. I was worried. Because, I did not have the strength to carry him . . . He could not do anything. I had to dress him. Take him to the bath. Even with the seat, I had to sit him down. Because, he could not look down. When he did look down, he was getting headaches. And, he was unsteady. I had to be with him.

AR at 208–09. These statements themselves, even if true, would not entitle Plaintiff to relief. "[E]ven if Plaintiff's wife did assist him for some time with activities of daily living, that is insufficient to demonstrate that Plaintiff *required* such assistance, and . . . his wife's statement suggests the contrary: that Plaintiff could walk . . . and that Plaintiff's wife 'did not have the strength to carry him.'" Dkt. 19-1 at 20 (emphasis added) (citing AR at 208).

*Nurse Teri Burns*. The Board gave Ms. Burns' statement little weight because she had no firsthand knowledge of the injury, and her conclusions were not supported by the contemporaneous medical documents. AR at 755. In general, courts have found that agencies like the Board are "justified in attaching little or no weight" to a certifying physician's claims when the statements were "made years after the injury on the basis of the medical records alone, not first-hand knowledge." *Hensley*, 292 F. Supp. 3d at 409–10 (citing *Coker v. United States*, No. 15-cv-202, 2016 WL 7242727, at *6 (W.D. Ky. Dec. 14, 2016)).

*Doctor Sean Sebesta's Statement*. Plaintiff argues that Dr. Sebesta's statement was "discarded and disagreed on by the Board simply because he released Plaintiff on May 24, 2011 'without restrictions,'" and that the Board "failed to consider or simply disregarded the other

notes by Dr. Sebesta on the same medical record dated May 24, 2011." Dkt. 17-3 at 14–15.  Not so.  The Board acknowledged Dr. Sebesta's other notes but found that they did not support his conclusion:

> The Board reviewed and considered other evidence in the record including an SGLV 8600 completed by Dr. Sebesta in 2013, two years after the event.  Dr. Sebesta saw the applicant on 24 May 2011 and completed the form based on that *one visit* and a review of the medical records.  He concluded that the applicant was unable to perform four ADLs independently for a period of three months due to chronic nausea with intermittent vomiting, instability while standing, and a restriction on bending over.  *The Board disagrees that the medical records support such a conclusion and notes the lack of medical records during most of that period.*  The Board gives greater weight to Dr. Sebesta's medical note in which he released the applicant without restrictions on 24 May 2011.

AR at 755 (emphasis added).  The Court agrees with the Board, and, in any event, cannot second-guess the Board's weighing of Dr. Sebesta's contemporaneous medical records and a SGLV 8600 certification he signed three years later.

At bottom, the Board's final decision rests on its evaluation of conflicting evidence between the contemporaneous medical records and the statements provided to supplement Plaintiff's appeal.  The Board determined that the contemporaneous evidence did not demonstrate by a preponderance of the evidence that Plaintiff could not perform two ADLs without his wife's assistance for fifteen straight days.  *Id.* at 754–55.  To be sure, Plaintiff's injury caused great discomfort and pain.  But the Board did not determine that "a selected few medical treatment entries were more persuasive and reliable than other evidence submitted by Plaintiff when determining Plaintiff's ability to perform ADLs independently." Dkt. 22 at 4.  Instead, the contemporaneous medical treatment entries conflict with Plaintiff's claim.  As a result, this Court cannot say that the Board acted arbitrarily or capriciously when it denied Plaintiff's claim.

## IV. CONCLUSION

For all these reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment (Dkt. 19) and **DENIES** Plaintiff's Motion for Summary Judgment (Dkt. 17).

It is **SO ORDERED.** This is a final appealable order. FED. R. APP. P. 4(a).

Date: September 26, 2023

ANA C. REYES
United States District Court Judge